[No. B201604. Second Dist., Div. One. May 22, 2008.]

In re JORGE G., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
MARIA G. et al., Defendants and Appellants.

## COUNSEL

Harry Zimmerman, under appointment by the Court of Appeal, for Defendant and Appellant Maria G.

Karen B. Stalter, under appointment by the Court of Appeal, for Defendant and Appellant Jorge A.

Raymond G. Fortner, Jr., County Counsel, James M. Owens, Assistant County Counsel, and Fred W. Klink, Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

**MALLANO, Acting P. J.**—Maria G. (Mother) and Jorge A. (Father) appeal from August 21, 2007 jurisdiction and dispositional orders declaring their teenage son Jorge G. to be a dependent of the juvenile court pursuant to Welfare and Institutions Code section 300, subdivisions (a) (physical abuse), (b) (failure to protect), and (g) (no provision for support) and removing him from parental custody.[1] We conclude that the juvenile court properly invoked temporary emergency subject matter jurisdiction under Family Code section 3424, subdivision (a). But because of improper service of notice, the jurisdiction and dispositional orders will be reversed and on remand the juvenile court will be directed to vacate the orders and to afford a reasonable time for proper service of the parents in Mexico under the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, November 15, 1965 (20 U.S.T. 361, T.I.A.S. No. 6638) (hereinafter the Hague Service Convention).

## BACKGROUND

In April 2007, the Los Angeles County Department of Children and Family Services (DCFS) detained Jorge and placed him in foster care after receiving information that both of his parents were in prison in Mexico on robbery and drug charges. Jorge's paternal grandmother also was in prison in Mexico for

---

[1] Unspecified statutory references are to the Welfare and Institutions Code.

murdering his paternal grandfather, the maternal grandparents were deceased, no other family members in Mexico were willing to care for him, and he had no family and knew no one in the United States.

Jorge gave DCFS various reports of his age, from age 13 (with a birth date in December 1993), to age 17 (with a birth date in December 1989). Jorge admitted that he lied about his age because he believed that being younger would "fast track" his immigration status once he was in protective custody. Jorge also stated that he sometimes lied about being older, with a 1989 birth date, so he would be able to work more. He produced a document from 2004, which the juvenile court characterized as a "civil registry, not a birth certificate," which listed his birth date in December 1993. Jorge first told DCFS that he had the document altered, but later told DCFS that when Mother and his stepfather went to register him, Mother told them he was born in 1991, but a secretary wrote down 1993. The paternal aunt in Mexico initially told DCFS that Jorge was born in 1990, but later told DCFS that he was born in 1991. When the parents were interviewed by telephone in July 2007, Father told DCFS that Jorge was born in December 1992, but then Mother got on the telephone and corrected Father to say that Jorge was born in December 1991. According to bone age X-rays obtained by DCFS in April 2007, Jorge's skeletal age was consistent with that of a 17 year old, plus or minus 15.4 months.

According to Jorge, when he was young, his parents sold drugs and would hide drugs on his person because the police would not search him. His parents also placed a gun to his head and used him as a hostage when they robbed people on trains. His parents hit and slapped Jorge with a water hose, cables, wooden blocks and whatever was around. According to the paternal aunt, the parents would give Jorge pills to make him fall asleep so he would not cry.

After his parents were incarcerated, Jorge lived briefly with his paternal aunt. The paternal aunt told DCFS that Jorge spent some time in a Mexican child welfare agency, but he was treated badly and "I think Jorge just left." The paternal aunt could not care for Jorge because life in Mexico was difficult and she was taking care of her six children. Jorge stated that he received some assistance from the Mexican child welfare agency, but "there are no records." Jorge lived on the streets in Mexico until he made his way to the United States for the first time in November 2004. Jorge was caught by United States immigration officials and deported about four times; he told immigration officials he was 18 years old and they believed him. The last time he crossed the border, he went to Phoenix and then Las Vegas, where he worked "side jobs by getting picked up in front of Home Depot" and also worked in a restaurant. He saved some money and came to Los Angeles,

where he stayed at the Rescue Mission, then Angel's Flight, and then Freedom House, which serves youths ages 14 to 17.

At the detention hearing in April 2007, attorneys were appointed to represent the parents. Jorge told the court that he was born in 1991 and would be 16 in December 2007. The court set a pretrial resolution conference for May 29, 2007. In May 2007, DCFS filed declarations of due diligence regarding the efforts to locate the parents. The declarations detailed unsuccessful searches for the parents in the United States even though DCFS suspected that the parents were incarcerated in Mexico. On May 29, 2007, the juvenile court continued the matter to July 19, 2007, and ordered DCFS to exercise due diligence to locate the parents in prison in Mexico. Jorge was ordered into counseling.

On July 19, 2007, DCFS filed a first amended petition alleging that Jorge was a dependent of the juvenile court under section 300, subdivisions (a), (b), and (g), based on the parents' hitting Jorge with various objects and giving him pills for him to fall asleep; the parents' failure to provide him with care, supervision, and the necessities of life due to their incarceration; the parents' history of drug abuse; and the parents' emotional abuse by forcing Jorge to participate in their criminal activities.

According to an interim review report filed on July 19, 2007, DCFS attempted to mail notices of the July 19 hearing on the petition to the parents on July 3, 2007, by certified mail-Federal Express, but the Federal Express agent in Mexico indicated that he would not be able to deliver the documents to the parents in prison.

On July 10, 2007, a DCFS investigator interviewed the parents by telephone about the allegations of the first amended petition. The parents denied hitting Jorge and denied involving him in their criminal activities, but they both admitted robbing people to feed their family and using marijuana in the past. Mother stated that she expected to be released from prison in eight months.

Father told DCFS that if Jorge "wants to stay over there it's fine. He's big. He is going to make his own decision." Father also stated that he and Mother "want the best for him. I appreciate everything you've done for him. We can't do anything we are poor this is why we are in prison." Father told DCFS that he had a relative in Tijuana and Father could obtain his telephone number; Father also had an uncle that lived in the United States, but Father did not know in which city. According to Father, Jorge telephoned Father in January 2007, but Father also claimed that "[w]e haven't known anything about him in over one year."

According to proofs of service, DCFS sent the parents copies of the first amended petition and notice of the July 19, 2007 hearing on July 10, 2007, by first class mail, addressed to them in prison. At the hearing on July 19, the juvenile court found that the notice was not proper because it did not state that DCFS was recommending the parents receive no reunification services. Counsel for the parents did not waive defects in the notice. The matter was trailed to August 21, 2007, for adjudication and a contested disposition hearing. On August 1, 2007, DCFS sent notices of the August 21 hearing to the parents in prison by first class mail.

At the August 21, 2007 hearing, counsel for the parents argued for dismissal of the petition on the ground that the juvenile court lacked jurisdiction over Jorge because his legal residence was not in the United States. The parents' counsel questioned Jorge's credibility and whether Jorge was a minor; they also asserted that if he was a minor, the Mexican child welfare authorities should take care of Jorge, not DCFS. The juvenile court reasoned, "I only need one of three things and one of the three is that [Jorge] was found in L.A. County. So, I have proper venue and jurisdiction."[2] The juvenile court found proper notice, determined Jorge was born in 1991, sustained the allegations of the first amended petition, removed Jorge from his parents' custody, and ordered family reunification services. The parents, through their respective counsel, appealed from the August 21, 2007 orders.

## DISCUSSION

### A. Subject Matter Jurisdiction

We agree with DCFS that the juvenile court had temporary emergency subject matter jurisdiction under Family Code section 3424, subdivision (a) (see fn. 2, ante), and therefore reject the parents' arguments that Jorge was neither a minor nor abandoned within the meaning of the Act.

"The Act 'is the exclusive method of determining the proper forum in custody disputes involving other jurisdictions and governs juvenile dependency proceedings.' . . . [¶] We are not bound by the juvenile court's findings regarding subject matter jurisdiction, but rather 'independently reweigh the

---

[2] As acknowledged by Father's opening brief, the juvenile court was invoking temporary emergency jurisdiction under Family Code section 3424, subdivision (a), which provides: "A court of this state has temporary emergency jurisdiction if the child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to, or threatened with, mistreatment or abuse."

Family Code section 3424 is part of the Uniform Child Custody Jurisdiction and Enforcement Act (Fam. Code, § 3400 et seq.; hereinafter Act).

jurisdictional facts.' " (*In re A. C.* (2005) 130 Cal.App.4th 854, 860 [30 Cal.Rptr.3d 431] (*A. C.*).) Foreign countries are treated as states for purpose of determining jurisdiction. (*Ibid.*)

Family Code section 3424, subdivision (a) " '[makes] clear that emergency jurisdiction could be exercised to protect a child only on a temporary basis until the court with appropriate jurisdiction issued a permanent order. [Citation.]' [Citation.] An 'order assuming emergency jurisdiction under the Act has time limitations. It must specify "a period that the court considers adequate to allow the person seeking an order to obtain an order from the state having jurisdiction." [Citation.] It "remains in effect until an order is obtained from the other state within the period specified or the period expires." [Citation.]' [Citation.]" (*A. C., supra*, 130 Cal.App.4th at p. 863.) "Even though emergency jurisdiction ordinarily is intended to be short term and limited, the juvenile court may continue to exercise its authority as long as the risk of harm creating the emergency is ongoing." (*In re Angel L.* (2008) 159 Cal.App.4th 1127, 1139 [72 Cal.Rptr.3d 88].) "We infer from this statutory scheme the Legislature's intent to afford all children found in California the protection of California's juvenile court in exigent circumstances. . . . 'Aside from the necessity of protecting a child from immediate harm, presence of the child in the state is the only prerequisite' to taking action. [Citation.]" (*Id.* at p. 1138.)

"The finding of an emergency is to be made only after an evidentiary hearing, although the juvenile court can detain the child before that hearing." (*A. C., supra*, 130 Cal.App.4th at p. 864.) And emergency jurisdiction continues over the minor after the determination of the existence of an emergency " 'because of the emergency presented by the abuse of the child, and the impossibility of returning [him] immediately to [his] parents.' " (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1175 [108 Cal.Rptr.2d 493], quoting *In re Stephanie M.* (1994) 7 Cal.4th 295, 312 [27 Cal.Rptr.2d 595, 867 P.2d 706].)

■ After independently weighing the jurisdictional facts, we conclude that the juvenile court properly invoked temporary emergency jurisdiction on the ground that Jorge was a minor and that he was abandoned within the meaning of Family Code section 3424, subdivision (a). " 'Abandoned' " is defined in Family Code section 3402, subdivision (a) as "left without provision for reasonable and necessary care or supervision."

■ The determination that Jorge was born in December 1991 is supported not only by the bone age X-ray, but by the statements of Mother and Jorge's paternal aunt. Even if we assume his date of birth is December 1990, as first stated by the paternal aunt, Jorge will not turn 18 until December 2008. And because his parents admitted that they were incarcerated and that

they were unable to care for him at that time, we conclude that Jorge was abandoned within the meaning of the Act. The parents point to Father's statement to DCFS that relatives, one in Tijuana and one somewhere in the United States, could possibly care for Jorge. But Father admitted having a telephone conversation with Jorge in January 2007, when Jorge was living on his own, and Father did not thereafter call those relatives or make any provisions for Jorge's care or supervision. The weight of the evidence supports the invocation of the juvenile court's temporary emergency jurisdiction. Were we to find no subject matter jurisdiction, Jorge would be left without any source of protection. Accordingly, the juvenile court had subject matter jurisdiction and personal jurisdiction over Jorge. But the "[a]ssumption of emergency jurisdiction does not confer upon the state exercising emergency jurisdiction the authority to make a permanent custody disposition." (*In re C. T.* (2002) 100 Cal.App.4th 101, 108 [121 Cal.Rptr.2d 897].)

But as explained below, the juvenile court did not have personal jurisdiction over the parents and the August 21, 2007 jurisdiction and dispositional orders must be reversed as to them.

B.  *Personal Jurisdiction and Notice*

Inasmuch as DCFS does not contend that the parents voluntarily submitted to the authority of the court or made a general appearance, compliance with the statutes governing service of process is essential to establish the court's personal jurisdiction over them. (*Floveyor Internat., Ltd. v. Superior Court* (1997) 59 Cal.App.4th 789, 793 [69 Cal.Rptr.2d 457].)

We reject the contention of DCFS that issues of personal jurisdiction and notice were waived because the parents were each represented by counsel below, and their counsel appeared and did not raise the issue of inadequate notice. The cases cited by DCFS are inapposite because they do not deal with the issue of personal jurisdiction. In *In re Joseph E.* (1981) 124 Cal.App.3d 653 [177 Cal.Rptr. 546], an appeal from an order terminating parental rights, the court determined that the parent waived the issue of lack of notice of an original juvenile court dependency proceeding because he appeared several years later in a superior court proceeding without raising the issue of lack of proper notice of the prior proceeding. (*Id.* at p. 657.) In *In re Cynthia C.* (1997) 58 Cal.App.4th 1479 [69 Cal.Rptr.2d 1] the de facto parent appealed from an order denying her petition for modification, wherein she contended that the social services agency improperly removed the child from her home without due process and proper notice. The court held that the de facto parent had waived the issue of lack of notice and due process rights because she failed to raise it below or in a prior petition for a writ. (*Id.* at p. 1491.)

■ The Hague Service Convention applies to juvenile dependency cases brought under section 300. (*In re Alyssa F.* (2003) 112 Cal.App.4th 846, 852 [6 Cal.Rptr.3d 1] (*Alyssa F.*).) Both the United States and Mexico are signatories to the Hague Service Convention. (*Alyssa F.*, at p. 852.)

"The Hague Service Convention was 'intended to provide a simpler way to serve process abroad, to assure that defendants sued in foreign jurisdictions would receive actual and timely notice of suit, and to facilitate proof of service abroad.' " (*Alyssa F., supra,* 112 Cal.App.4th at p. 852.) "Articles 2 through 6 of the Hague Service Convention establish a system whereby each participating country designates a 'Central Authority' that receives and either rejects or executes requests for service of process." (*Ibid.*) But the Hague Service Convention also recognizes methods of service other than through the Central Authority; article 10 permits service by a method that is valid under both Mexican and California law. (*Alyssa F.*, at pp. 853–854.)[3]

■ Service of process by ordinary mail does not perfect service in Mexico; nor does service by first class mail or leaving a telephone message with a parent who was not present at the detention hearing constitute adequate service of notice of the jurisdiction and dispositional hearings under section 291, subdivision (e)(1). (*Alyssa F., supra,* 112 Cal.App.4th at pp. 853–854.)[4]

We conclude that service on the parents was not proper under either Mexican or California law. Accordingly, the defective service renders all subsequent proceedings void, even if the party had actual notice of the proceedings. (*Alyssa F., supra,* 112 Cal.App.4th at p. 852; see also *Balcom v. Hiller* (1996) 46 Cal.App.4th 1758, 1763 [54 Cal.Rptr.2d 536]; *Honda Motor Co. v. Superior Court* (1992) 10 Cal.App.4th 1043, 1048 [12 Cal.Rptr.2d 861].)

DCFS admits, and we agree, that there are no cases which apply a harmless error analysis to insufficient notice under the Hague Service

---

[3] As quoted in *Alyssa F.,* article 10 of the Hague Service Convention provides: " 'Provided the State of destination does not object, the present Convention shall not interfere with—[¶] (a) the freedom to send judicial documents, by postal channels, directly to persons abroad, [¶] (b) the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination, [¶] (c) the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination.' (Hague Service Convention, *supra,* 20 U.S.T. 361, Art. 10.)" (*Alyssa F., supra,* 112 Cal.App.4th at p. 853.)

[4] Section 291, subdivision (e)(1) provides: "Service of notice of the hearing shall be given in the following manner: [¶] (1) If the child is detained and the persons required to be noticed are not present at the initial petition hearing, they shall be noticed by personal service or by certified mail, return receipt requested."

Convention. Nevertheless, DCFS urges that we apply the "beyond a reasonable doubt" standard of prejudice here, citing our opinion in *In re J.H.* (2007) 158 Cal.App.4th 174 [70 Cal.Rptr.3d 1] (*J.H.*) and the Second Circuit case of *Burda Media, Inc. v. Viertel* (2d Cir. 2005) 417 F.3d 292 (*Burda Media*). Neither of these cases is on point. *J.H.* involved an appeal by a father from an order terminating his parental rights after he appeared in court at the hearing and challenged the propriety of the notices with respect to previous orders, where DCFS had attempted to serve notice on him. Thus, *J.H.* involved a collateral attack on due process grounds, but did not involve the issue of personal jurisdiction. Under those circumstances, we held that where there is an attempt to serve notice on the parent, but the notice does not comply with statutory provisions, the error in notice is "subject to the harmless beyond a reasonable doubt standard of prejudice." (*J.H., supra*, 158 Cal.App.4th at p. 183.)

In *Burda Media*, the defendant, served in France under the Hague Service Convention, appealed from the denial of his motion to vacate a default judgment on the ground that it was void for lack of personal jurisdiction. The Second Circuit held that the failure of France's Ministry of Justice to return a formal certificate confirming service was not fatal to effective service because the plaintiff filed police reports confirming service of process, which served the purpose of the certificate, and the defendant failed to prove that he did not receive the summons. (*Burda Media, supra*, 417 F.3d at pp. 301–303.) Here, there was no attempt by DCFS to serve the parents through Mexico's central authority and no issue involving a certificate confirming service. *Burda Media* does not support the proposition that the notice errors herein are subject to a harmless error analysis.

Although we agree with the parents that the jurisdiction and dispositional orders must be vacated, we do not agree that the first amended petition must be dismissed. Courts have held that notwithstanding improper service under the Hague Service Convention, "there is no need to dismiss this case without first providing a reasonable opportunity to accomplish such proper service." (*Trask v. Service Merchandise Co., Inc.* (D.Mass. 1991) 135 F.R.D. 17, 22 [in personal injury case, motion to dismiss by defendant (Japanese bicycle part manufacturer) was denied without prejudice to renew motion if plaintiff did not effect service under the Hague Service Convention within 45 days].) Thus, on remand the juvenile court will be directed to set a new jurisdiction hearing and to afford DCFS a reasonable time to effect proper service on the parents. In light of this disposition, we need not address Mother's challenges to the sufficiency of the evidence to support the jurisdictional findings.

## DISPOSITION

The jurisdiction and dispositional orders of August 21, 2007, are reversed and on remand the juvenile court is directed to vacate the orders and to provide the Department of Children and Family Services a reasonable amount of time to effect proper service on Maria G. and Jorge A.

Vogel, J., and Rothschild, J., concurred.